IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| BREANNA CHEADLE, on behalf of her minor child, N.C., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 21-cv-06084-SRB ) |
| NORTH PLATTE R-1 SCHOOL DISTRICT, | ) ) |
| Defendant. | ) ) |

## ORDER

Before the Court is Plaintiff Breanna Cheadle's ("Cheadle") Motion for Declaratory and Injunctive Relief. (Doc. #1.) In that Motion, Cheadle requests the Court enter a preliminary injunction ordering Defendant North Platte R-1 School District ("North Platte") to lift its forty-five-day suspension of Cheadle's minor child, N.C., participation in the 8th Grade Girls' Volleyball Team ("Team") competitions. On August 5, 2021, the Court presided over a preliminary injunction hearing. Counsel for all parties were present. Upon consideration of the entire record, and for the reasons stated below, Cheadle's motion for a preliminary injunction is DENIED.

   I.   **BACKGROUND**

North Platte is a public school district in Dearborn, Missouri. N.C. is a middle schooler at North Platte and a member of the Team. N.C. attended seventh grade during the 2020-2021 school year and is entering eighth grade for the 2021-2022 school year. While at home on Sunday, May 9, 2021, N.C. recorded a video of herself drinking alcohol and shared the video with a private Snapchat group. Several members of that Snapchat group had seen the video and wrote comments on N.C.'s account. At approximately 10:30 PM, Cheadle discovered N.C. "on

her bedroom floor, incoherent and on the verge of losing consciousness." (Doc. #1, ¶ 5.) Cheadle called emergency services, and an ambulance transported N.C. to the hospital. At the hospital, N.C. was diagnosed with acute alcohol poisoning. During oral arguments, Cheadle revealed that a North Platte employee was among the medical staff who treated N.C. After returning from the hospital, Cheadle discovered the Snapchat group and immediately posted two messages on N.C.'s account, condoning the group's behavior. The first message read as follows:

> Hello....This is [N.C.'s] mom. I wanted to let you all know that she is still alive. In her SC video she posted earlier - which some of you thought was funny (I've read alllll of the messages) - you actually witnessed her having a life-threatening medical emergency. I found her on the bedroom floor, incoherent, and on the verge of blacking out. I called an ambulance and had her transported to the hospital. She had acute alcohol overdose and her levels were three times higher than an adult. We are finally back home and she will be recovering for a while. A 13 yo's body is not designed for that. And for those of you who may have suggested, encouraged, dared, ect.[sic] for her to do anything, just know I know who you are. And while you may not be getting a notification in your messages that says I've screenshot the chat - you won't - because I've screenshot them from MY phone instead.

(Doc. #1, ¶ 12.) The second message continued:

> ….it's pretty terrifying to find your kid on the floor who only keeps saying "help me" over and over but can't put the words all together in a straight sentence to tell you what's wrong or what happened. For a parent - It's traumatic. I'll never be able to wipe this from my mind. Learn from other people's mistakes and bad decisions, people, so you don't have to find out the hard way yourself.

(Doc. #1, ¶ 13.) N.C. eventually recovered and returned to school on Tuesday, May 11, 2021.

Following N.C.'s return to school, North Platte learned of N.C.'s alcohol consumption from students and parents, who shared screenshots of Cheadle's two Snapchat messages. Students also reported that N.C. commented on the incident when she returned to school. On May 13, 2021, North Platte informed Cheadle that N.C.'s alcohol consumption violated the

2

Alcohol and Drug Rule of the student handbook, and that N.C. would be disciplined accordingly. Both N.C. and her parents had signed the student handbook. The pertinent rule language is:

> **Alcohol and Drug Rule**
> Any student selling, purchasing, distributing, in possession of, or under the influence of any alcohol or drugs, on or off campus will be dealt with.
>
> > o First Offense: The student will be suspended from participating in extracurricular competition for a period of 45 days. The 45 days will begin with the start of the specific season or when the incident occurred, whichever is later. The suspension will carry from one sport to another sport . . . .

(Doc. #10, p. 3.) While explaining the rationale behind the suspension, North Platte stated that "[N.C.] is not being held accountable for [Cheadle's] posts," but rather, "[N.C.] is being held accountable for her actions." (Doc. #1, ¶¶ 33-34.)

Without injunctive relief, N.C.'s athletic suspension from Team competitions will begin on the first day of her eighth-grade volleyball season, August 16, 2021, and end on September 29, 2021. The suspension spans approximately half of the volleyball season. During this period, North Platte will allow N.C. to practice with the Team, but not compete in games.

Cheadle claims that the suspension violates her and N.C.'s First Amendment right to free speech. Specifically, Cheadle argues that the two Snapchat messages she wrote and the Snapchat video of N.C. drinking alcohol are protected speech, and that North Platte's discipline of N.C. is an unconstitutional restriction of that speech. Because the volleyball season starts on August 16, 2021, Cheadle argues a preliminary injunction is necessary to prevent irreparable harm. North Platte disagrees with Cheadle and opposes the preliminary injunction. The Court addresses the parties' arguments below.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 65, the Court may issue a preliminary injunction. Fed. R. Civ. P. 65(a). To determine the propriety of injunctive relief, courts must consider four factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the threatened harm and the injury the injunction will inflict on other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). All four factors must be examined "to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citations and quotation marks omitted). However, "the likelihood of success on the merits is most significant." *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (citations and quotations omitted). The burden of establishing the need for a preliminary injunction lies with the moving party. *Baker Elec. Co-op.*, 28 F.3d at 1472.

## III. DISCUSSION

### A. Plaintiff has not Shown a Likelihood of Success on the Merits

In evaluating the likelihood of success on the merits, a court does not decide whether the movant will "ultimately win." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991); *see also O'Connor v. Peru State College*, 728 F.2d 1001, 1002 (8th Cir. 1984) (noting that at the preliminary injunction stage, a "court should avoid deciding with any degree of certainty who will succeed or not succeed"). Instead, a court considers whether the movant's position is fairly supported by governing law. *See Glenwood Bridge*, 940 F.2d at 371. As a claim under 42 U.S.C. § 1983, federal law governs this controversy. Upon review of the record and applicable case law, the Court finds that Plaintiff has failed to show a likelihood of success on the merits.

"[M]inors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011). However, "the First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation and internal quotation marks omitted). Schools have an interest in regulating student speech, which "remain[s] significant in some off-campus circumstances." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021). Schools also have an interest in "deterring alcohol consumption among students, a goal which is not only legitimate, but highly compelling." *Bush By & Through Bush v. Dassel-Cokato Bd. of Educ.*, 745 F. Supp. 562, 572 (D. Minn. 1990). Additionally, the First Amendment does not "afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech." *Cox v. Louisiana*, 379 U.S. 536, 555 (1965). Therefore, the Court must first classify the target of North Platte's regulation to determine what First Amendment protections, if any, are afforded to Cheadle and N.C and if those protections were unconstitutionally violated.

**1. Defendant Is Regulating N.C.'s Conduct**

Cheadle claims that her Snapchat messages and N.C.'s Snapchat video are protected speech under the First Amendment. Specifically, she argues that North Platte violated her right to free speech by using those messages as evidence to suspend N.C. North Platte denies that the First Amendment is implicated by its actions. North Platte claims it did not intend to chill, squelch, or compel speech by suspending N.C. Rather, North Platte claims the suspension is punishing N.C. for illegal conduct.

Cheadle analogizes her and N.C.'s Snapchat usage to *Mahanoy*. In *Mahanoy*, a high school student, B.L., posted two captioned photos to Snapchat. *Mahanoy*, 141 S. Ct. at 2043. "The first image B.L. posted showed B.L. and a friend with middle fingers raised; it bore the caption: 'Fuck school fuck softball fuck cheer fuck everything.' The second image was blank but for a caption." *Mahanoy*, 141 S. Ct. at 2043. "The student's speech took place outside of school hours and away from the school's campus." *Id.* at 2042-41. However, other students took screenshots of the two Snapchat photos and "shared them with other members of the cheerleading squad." *Id.* at 2043. The photos eventually reached the school principal and cheerleading coaches, who "decided that because the posts used profanity in connection with a school extracurricular activity, they violated team and school rules. As a result, the coaches suspended B. L. from the junior varsity cheerleading squad." *Id.*

The Supreme Court was clear that the decision does "not now set forth a broad, highly general First Amendment rule." *Id.* at 2045. The Court then held "that the school violated B.L.'s First Amendment rights." *Id.* at 2048. The Court classified the Snapchat photos as "criticism, of the team, the team's coaches, and the school—in a word or two, criticism of the rules of a community of which B.L. forms a part." *Id.* at 2046. Despite the vulgarity, "B.L. uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection." *Id.* at 2046-47. The Court then weighed B.L.'s free speech interest against "the school's interest in teaching good manners and consequently in punishing the use of vulgar language aimed at part of the school community." *Id.* at 2047. The school's anti-vulgarity interest was weakened because "B.L. spoke outside the school on her own time," "the school did not stand *in loco parentis*," and no evidence proved the existence of a "'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's

6

action." *Id.* For these reasons, the Court found that B.L.'s free speech interest outweighed the school's regulatory interest.

The analogy between B.L.'s Snapchat photos and N.C.'s Snapchat video is a faulty one. B.L.'s Snapchat photos were pure speech. In comparison, North Platte is allegedly regulating a videorecording of N.C. consuming alcohol. When a minor consumes alcohol, she is engaging in an illegal act, not pure speech. North Platte's statements indicate that it intended to punish N.C.'s conduct, not her or Cheadle's speech, and its actions are consistent with that intention. North Platte did not ask N.C. to delete the video and it did not try to suppress Cheadle's messages. Nothing in the record indicates that North Platte required N.C. or Cheadle to revoke previous statements, issue new statements, or apologize for conduct. To the extent that Cheadle and N.C. expressed a particularized message, North Platte has not attempted to suppress that message. Rather, the facts indicate that North Platte suspended N.C. for her conduct, not for her speech.

Cheadle does not suggest that N.C. intended her video to convey any particularized message, either through the use of language or other means. At best, the video depicted ill-fated drunken revelry to an audience of impressionable minors. Whatever the case, N.C.'s intended message lacks the same level of First Amendment value as B.L.'s criticism in *Mahanoy* because N.C. was engaged in illegal conduct, not pure speech, and was not engaged in criticism of her community, which is normally afforded strong protection.

Cheadle does not contest that N.C. was consuming alcohol, in violation of school policy and Missouri Law. Instead, Cheadle argues that North Platte cannot use her Snapchat messages, which did criticize the school community, as evidence of N.C.'s illegal conduct. Like B.L., Cheadle's "criticism did not involve features that would place it outside the First Amendment's

7

ordinary protection," such as fighting words or obscenity. *Id.* at 2046. But, even if the Court cannot separate Cheadle's speech from N.C.'s conduct, as Cheadle suggests, that, without more, does not make N.C.'s conduct protected speech. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Therefore, North Platte may properly consider the messages as evidence of N.C.'s illegal conduct. And while N.C.'s alcohol consumption occurred entirely off-campus, after school-hours, she made comments about her alcohol overdose to other students upon returning to class. Through these comments, N.C. personally produced, on school grounds, additional evidence of her misconduct. Additionally, North Platte learned of the alcohol incident from its employee who was present at the hospital where N.C. was treated. All of these facts indicate that N.C.'s conduct is the target of North Platte's regulation, and not her or Cheadle's speech.

## 2. N.C. was not Engaged in Expressive Conduct

In addition to verbal and written statements, the First Amendment protects expressive conduct that is "sufficiently imbued with elements of communication." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Examples of expressive conduct include "nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1741–42 & n.1 (Thomas, J., concurring in part and in the judgment). In comparison, acts such as smoking are not expressive conduct. *See Gallagher v. City of Clayton*, 699 F.3d 1013, 1021 (8th Cir. 2012).

The party "desiring to engage in assertedly expressive conduct [must] demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). To determine if an action is expressive conduct, a court will ask "whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404.

N.C. did not engage in expressive conduct when she consumed alcohol. The Court finds alcohol consumption is more akin to non-expressive conduct, such as smoking, than expressive conduct, such as flag burning. Cheadle does not cite any authority disputing this conclusion. Expressive conduct must convey a particularized message. As addressed above, the intended message of a minor drinking alcohol is not apparent, and Cheadle fails to identify how an audience of middle schoolers on Snapchat would understand N.C.'s conduct as an expression of a particularized message.

For comparison, the First Amendment does protect students who wear black armbands "to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969). The Constitution also protects a protestor's right to burn an American flag, because the "expressive, overtly political nature of this conduct [is] both intentional and overwhelmingly apparent." *Johnson*, 491 U.S. at 406 (1989). Nothing in the facts indicate that N.C.'s alcohol consumption was associated with a protest against the school or government, a hallmark of expressive conduct.

North Platte argues that if this Court finds the act of underage drinking to be expressive conduct, such a decision would not only undermine a school's interest in protecting its students from alcohol and drug use, but would also more generally undermine the government's ability to

set a minimum drinking age. Cheadle does not directly respond to this argument. Instead, the only argument Cheadle advances to support the contention that N.C. engaged in speech or expressive conduct is that the alcohol consumption was recorded on Snapchat. This does not change the Court's conclusion, as simply publicly violating the law, without more, does not transform illegal conduct to protected speech.

Support for this conclusion is found in *United States v. O'Brien*, 391 U.S. 367 (1968). In *O'Brien*, "O'Brien and three companions burned their Selective Service registration certificates on the steps of the South Boston Courthouse." *Id.* at 369. O'Brien "had burned his registration certificate because of his beliefs, knowing that he was violating federal law." *Id.* Even though O'Brien's actions contained a communicative element, the Supreme Court upheld his conviction "because of the Government's substantial interest in assuring the continuing availability of issued Selective Service certificates, because amended [Section] 462(b) is an appropriately narrow means of protecting this interest and condemns only the independent noncommunicative impact of conduct within its reach, and because the noncommunicative impact of O'Brien's act of burning his registration certificate frustrated the Government's interest" *Id.* at 382.

N.C.'s alcohol consumption, like O'Brien's burning of his Selective Service certificate, is an illegal act. Additionally, as previously discussed, the Government's interest in deterring student alcohol consumption is a highly compelling goal. *Bush*, 745 F. Supp. at 572. Even if North Platte's decision were subject to strict scrutiny, North Platte's decision to suspend N.C. serves the Government's interest narrowly because, as addressed above, the suspension does not punish the communicative elements of N.C. and Cheadle's Snapchat usage. Rather, the suspension furthers a highly compelling interest by showing other students that North Platte will not tolerate alcohol consumption among the student body. Finally, one important distinction

10

Case 5:21-cv-06084-SRB   Document 15   Filed 08/16/21   Page 10 of 17

exists between *O'Brien* and the present case. O'Brien intended to convey a particularized message when he burned his Selective Service Certificate "in demonstration against the war and against the draft." *O'Brien*, 391 U.S. at 376. In comparison, Cheadle fails to identify the particularized message N.C. intended to convey through her conduct. The Government can regulate illegal expressive conduct, such as O'Brien's protest, and can also regulate illegal, non-expressive conduct such as N.C.'s alcohol consumption. Therefore, North Platte may regulate N.C.'s conduct without violating the First Amendment.

### 3. Defendant's Regulation Satisfies Rational Basis Review

Without a First Amendment violation, this case reduces to a challenge of the regulations governing participation in school athletics. "[R]egulations governing participation in school athletics are subject to the rational relationship test." *Bush*, 745 F. Supp. at 566. To satisfy rational basis review, North Platte's decision to suspend N.C. "need only be reasonably related to the [school's] legitimate concern in deterring alcohol use among its students." *Id.* at 571. Comparing the present case to *Bush* supports the conclusion that North Platte's regulation satisfies rational basis review.

In *Bush*, a high school student was caught attending a party where alcohol was present. *Id.* at 563. Despite not consuming any alcohol at the party, the student was suspended from the swim team in accordance with a rule prohibiting students from attending parties where alcohol was served. *Id.* at 564. The student argued that her associational rights under "the First Amendment to the United States Constitution protect[] her right to attend social gatherings at which minors are engaged in the unlawful consumption of alcohol." *Id.* at 566.

The Court found that the student "identified no First Amendment right, such as speech, press, religion, assembly, or petition for the redress of grievances, which [was] in any way

11

burdened by the school board regulation at issue in this case." *Id.* at 569. After rejecting the student's claim that the rule violated her First Amendment associational rights, the Court held that disciplining "a student for attending a party at which alcohol is consumed by minors is a reasonable means of deterring alcohol consumption among students." *Id.* at 572. As a result, the court "[found] that the school board regulation at issue [was] rationally related to the board's interest in deterring alcohol consumption among students." *Id.*

Here, North Platte's interest in suspending N.C. is identical to the *Bush* school's interest: deterring students from consuming alcohol. The dangers of drug and alcohol abuse to school children are well known:

> School years are the time when the physical, psychological, and addictive effects of drugs are most severe. Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound; children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor. And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661-62 (1995) (citations and internal quotation marks omitted). As the *Bush* court recognized, the school's interest in deterring alcohol abuse is strong enough to justify regulation of off-campus conduct.

The above factors emphasize another relevant distinction between *Mahanoy* and the present case: the regulatory interests at play. North Platte's interest in deterring middle schoolers from consuming alcohol is stronger than the *Mahanoy* school's interest in punishing high schoolers for vulgar language. The *Mahanoy* school's anti-vulgarity interest was weakened by the fact that B.L. spoke off campus, after school-hours. Allowing the school to regulate off-campus vulgarity would have prohibited vulgarity in "all the speech a student utters during the full 24-hour day." *Mahanoy*, 141 S. Ct. at 2046. In comparison, N.C. does not dispute that,

12

under Missouri law, minors are already prohibited from consuming alcohol.  Allowing North Platte to regulate N.C.'s conduct does not impose any new limits on acceptable behavior for middle schoolers.  Rather, North Platte's regulation is enforcing a widely recognized behavioral standard, that minors should not consume alcohol, and serving a legitimate interest by deterring minors from consuming alcohol.

Because N.C.'s suspension "does not burden the exercise of any constitutional right, the policy need only be reasonably related to the board's legitimate concern in deterring alcohol use among its students." *Bush*, 745 F. Supp. at 571.  "Disciplining of a student for attending a party at which alcohol is consumed by minors is a reasonable means of deterring alcohol consumption among students." *Id.* at 572.  Since prohibiting students from being in the presence of alcohol is rationally related to a school's deterrence interest, as it was in *Bush*, then a prohibition on the actual consumption of alcohol is also rationally related to that interest.  Therefore, North Platte's decision to suspend N.C. satisfies rational basis review.  Because Cheadle has failed to show that the suspension irrationally and arbitrarily infringes upon her and N.C.'s rights, Cheadle is unlikely to succeed on the merits.

### B.  Plaintiff has not Shown Irreparable Harm

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (citation and quotation marks omitted).  "[F]ailure to demonstrate irreparable harm, standing alone, may be a sufficient basis to deny preliminary injunctive relief." *Caballo Coal Co. v. Ind. Mich. Power Co.*, 305 F.3d 796, 800 (8th Cir.2002) (citing *Dataphase*, 640 F.2d at

114 n. 9). Under the facts presented here and the relevant case law, it is unlikely that the suspension will cause irreparable harm to N.C.

The Eighth Circuit's decision in *S.J.W.* offers guidance. In *S.J.W.*, a school district suspended two high school students, the Wilsons, "from Lee's Summit North for 180 days but allowed them to enroll in another school, Summit Ridge Academy, for the duration of their suspensions." *S.J.W.*, 696 F.3d at 774.

> The Wilsons claimed that the classes at Summit Ridge Academy were not academically challenging, that Summit Ridge Academy did not provide honors courses, and that Summit Ridge Academy did not provide ACT classes. The Wilsons also testified they wanted to pursue careers in music or theater, and their chances for college band scholarships would be hurt if they could not participate in the Lee's Summit North band.

*Id.* However, the court was "not convinced the Wilsons were at risk of any real academic harm," because Summit Ridge Academy is an accredited school in the same district as Lee's Summit North. *Id.* The court continued by reasoning that "any future harm to the Wilsons' careers was speculative. Speculative harm does not support a preliminary injunction." *Id.* at 779 (citation omitted).

The scope of N.C.'s suspension is much narrower than the suspension in *S.J.W.* The Wilsons' suspension disrupted actual learning opportunities in a high school setting. The Wilsons' inability to enroll in ACT and honors classes may have prevented them from earning scholarships at top universities. In comparison, Cheadle does not argue that N.C.'s academic opportunities are affected by her suspension. Even if they were, the Court does not find that impact is somehow greater than the high schoolers' academic performances in *S.J.W.*

Additionally, the impact on N.C.'s athletic opportunities is minimal. The suspension only applies to actual volleyball games, so N.C. may continue to practice with the Team during the suspension and continue to improve her skills. Thus, any risk to her physical health from

lack of exercise, and any risk to her mental health from lack of socialization, is significantly diminished, if not nonexistent. For all these reasons, Cheadle has not shown a threat of irreparable harm.

### C. The Balance of Harms Does not Support Injunctive Relief

In considering the balance of harms factor, a court weighs "the threat of irreparable harm shown by the movant against the injury that granting the injunction will inflict on [other parties]." *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quotation marks omitted) (citing *Dataphase*, 640 F.2d at 113). As discussed above, Cheadle argues that, without a preliminary injunction, N.C. will suffer the harm of missing half of her eighth-grade volleyball games. In response, North Platte contends that granting an injunction will undermine its ability to enforce the student handbook's Alcohol and Drug Rule.

The Court reiterates that North Platte has a highly compelling interest in deterring students from consuming alcohol and that Cheadle has failed to show how the suspension threatens N.C. with irreparable harm. Enjoining North Platte from enforcing the suspension against N.C. could undermine the Alcohol and Drug Rule's deterrence effect, signaling to other students that they can consume alcohol with impunity so long as it is simultaneously posted on social media. Should this occur, the injunction would diminish North Platte's ability to enforce its Alcohol and Drug Rule. Therefore, the balance of harms does not support injunctive relief.

### D. The Public Interest Neither Supports nor Opposes Injunctive Relief

Lastly, a court should consider the possible harm to the public interest if the preliminary injunction is granted. *Dataphase Sys., Inc.*, 640 F.2d at 113. Cheadle claims that the public interest supports injunctive relief due to the off-campus setting of N.C.'s alcohol consumption. She argues that "[a]lthough there is broad public interest allowing schools the ability to regulate

15

the conduct of students while on campus or at a school function, there is also significant public interest in preventing school officials from regulating conduct that occurs away from the school." (Doc. #1, ¶ 121.)

In response, North Platte argues that granting injunctive relief "would undermine the School District's concern for the health, safety, well-being of its students," and damage its role in curbing alcohol abuse among its students. (Doc. #10, p. 15.) In support of this interest, North Platte cites the following:

> Drug and alcohol abuse in public schools is a serious social problem today in every part of the country . . . . Perhaps no public school is safe from the scourge of drug and alcohol abuse among its students, and it is in the public interest to endeavor to avert the potential for damage, both to students who abuse and to those students, teachers, family members, and others who are collaterally affected by the abuse, before the problem gains a foothold.

*Miller v. Wilkes*, 172 F.3d 574, 580-81 (8th Cir. 1999).

The Court recognizes "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). But, as previously addressed, North Platte's interest in deterring students from abusing alcohol is highly compelling, even in off-campus settings. Additionally, "[j]udicial intervention in school policy should always be reduced to a minimum." *In re United States ex rel. Mo. State High School Activities Ass'n*, 682 F.2d 147, 152-53 (8th Cir. 1982).

Combined, these factors indicate that the public has a strong interest in North Platte's enforcement of the Alcohol and Drug Rule. Cheadle fails to demonstrate that the interests supporting injunctive relief should outweigh North Platte's interest in deterring alcohol consumption. Even if the public interest did support Cheadle's position, that interest cannot overcome her failure to show likely success on the merits, a threat of irreparable harm, and a balance of harms in her favor.

16

Case 5:21-cv-06084-SRB   Document 15   Filed 08/16/21   Page 16 of 17

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED** that Plaintiff's request for a preliminary injunction (Doc. #1) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
Dated: August 16, 2021  UNITED STATES DISTRICT JUDGE